T.C. Memo. 1995-488


UNITED STATES TAX COURT


CARL DIMICHELE AND EILEEN DIMICHELE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 12083-90, 18587-91.  Filed October 10, 1995.


<u>Robert E. Madden</u>, for petitioner Carl DiMichele.

<u>Stephen P. Patrizio</u>, for petitioner Eileen DiMichele.

<u>Douglas A. Fendrick</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following
deficiencies in and additions to petitioners' Federal
income tax:

| | | Additions to Tax | | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 1985 | $265,182 | -- | -- | $132,591 | [1] | $66,296 |
| 1986 | 22,927 | $1,146 | [1] | -- | -- | 5,732 |

[1] Fifty percent of interest due on the deficiency.

Unless stated otherwise, all section references are to the Internal Revenue Code as in effect during the years in issue.

Prior to trial, petitioner Carl DiMichele conceded liability for the above tax deficiencies and additions to tax, determined by respondent in two notices of deficiency issued to petitioners. At trial, respondent's attorney conceded that no part of the underpayment for 1985 was due to the fraud of petitioner Eileen DiMichele. Following those concessions, the only issue for decision is whether petitioner Eileen DiMichele qualifies as a so-called innocent spouse under section 6013(e) and should be relieved of liability for the subject tax deficiencies and the additions to tax for 1986. Therefore, all further references to "petitioner" are references to Mrs. DiMichele.

FINDINGS OF FACT

The parties have stipulated some of the facts in these consolidated cases. The Stipulation of Facts filed by the

parties and the exhibits attached thereto are incorporated herein by this reference. At the time the subject petitions were filed, petitioner resided in Philadelphia, Pennsylvania, and Mr. DiMichele resided at the Federal Correctional Institution in Loretto, Pennsylvania.

Petitioner was born Eileen Secatore on January 3, 1945, in Philadelphia, Pennsylvania. She graduated from high school and, after a marriage that lasted less than 1 year, she attended "hairdressing school" and briefly worked as a hairdresser. Petitioner met Mr. DiMichele in 1964, and they were married in 1970. Petitioner and Mr. DiMichele took up residence in a house located at 2010 South 15th Street in Philadelphia, Pennsylvania, that had been purchased by petitioner and her brother on October 22, 1969, for approximately $12,000. In addition to her son from her first marriage, petitioner's two brothers lived with the DiMicheles.

In 1978, a daughter, Christina, was born to petitioner and Mr. DiMichele. Christina was a hyperactive child, and in 1983, she was responsible for a fire that burned petitioner and damaged her home. Petitioner received two payments from her insurance company in the amounts of $32,700 and $28,103. As mentioned below, petitioner used these funds to open an account at Home Unity Savings & Loan.

During each of the years 1978 through 1986 inclusive,

petitioner filed a joint return with Mr. DiMichele.  Each of those returns states that petitioners' address was "406 Orchard Avenue, Somerdale, New Jersey 08083."  That is the address of a cousin of petitioner's husband.  Neither petitioner nor her husband ever lived at that address.  In fact, petitioner and her husband resided in the house located at 2010 South 15th Street from 1970 through the time of trial.

Petitioner's 1984 joint income tax return reports that the DiMicheles were paid total wages of $26,000 from a company, Out of the Past, Ltd.  According to Schedule W, Deduction For A Married Couple When Both Work, attached to the 1984 return, petitioner was paid $6,500 of the wages in that year and Mr. DiMichele was paid $19,500.  Petitioner's 1985 income tax return reports that petitioner was paid wages of $23,400 by Out Of The Past, Ltd.  During 1989 and 1990, petitioner was employed by Quality Sandwich Service, Inc., and she was paid wages of $11,700 and $9,120, respectively.  In passing, we note that petitioner's Form W-2, Wage and Tax Statement, for 1985 lists petitioner's address as "406 Archard Ave., Somer Dale, NJ 08083."

The following is a summary of the income reported on petitioner's joint income tax returns for 1978 through 1986:

| | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|---|---|
| **Schedule C** | | | | | | | | | |
| General Sign Co. | $3,925 | $18,809 | -- | -- | -- | -- | -- | -- | -- |
| **Wages--** | | | | | | | | | |
| General Sign Co. | -- | 1,200 | $28,700 | $4,000 | -- | -- | -- | -- | -- |
| **Wages--Out of the Past, Inc.** | | | | | | | | | |
| Mr. DiMichele | -- | -- | -- | -- | $18,000 | $26,000 | $19,500 | $2,400 | -- |
| Petitioner | -- | -- | -- | -- | -- | -- | 6,500 | 23,400 | -- |
| **Installment Sale of Business** | | | | | | | | | |
| Capital | -- | -- | -- | 8,658 | 380 | 363 | 11,726 | -- | -- |
| Ordinary | -- | -- | -- | 4,906 | 215 | 206 | 3,472 | -- | -- |
| Capital gain | -- | -- | -- | -- | -- | -- | -- | -- | $6,175 |
| **Schedule E** | | | | | | | | | |
| Vacant property | -- | -- | -- | (171) | -- | -- | -- | -- | -- |
| 1533 Emily | -- | -- | -- | -- | -- | -- | (1,243) | (1,996) | (1,846) |
| N. 5th St., Commercial Bldg. | -- | -- | -- | -- | -- | -- | -- | 5,070 | 9,605 |
| 1441 Shunk | -- | -- | -- | -- | -- | -- | -- | -- | (343) |
| 1433 Partnership | -- | -- | -- | -- | -- | -- | (5,208) | (2,899) | (1,245) |
| Interest | -- | -- | 140 | 10,113 | 11,921 | 11,311 | 14,920 | 16,925 | 11,200 |
| Dividends | -- | -- | -- | -- | -- | 18 | 62 | 77 | 137 |
| Total income | 3,925 | 20,009 | 28,840 | 27,506 | 30,516 | 37,898 | 49,729 | 42,977 | 23,683 |

During the period 1981 through May 7, 1989, Mr. DiMichele and others, including Mr. Michael Madgin, engaged in the illegal sale of methamphetamine, a controlled substance, in violation of 21 U.S.C. section 841. As part of that illegal activity, Mr. Madgin visited petitioners' home from time to time to purchase methamphetamine from Mr. DiMichele. On those visits, Mr. Madgin would occasionally deliver cash to Mr. DiMichele in amounts ranging from $25,000 to $100,000.

On one occasion in 1985 when Mr. DiMichele was not at home, Mr. Madgin gave petitioner a brown shopping bag containing $50,000 to $100,000 worth of cash to give to her husband. Mr. Madgin did not see petitioner open the bag. On another occasion in 1985, Mr. DiMichele, Mr. Madgin, and another individual counted money and discussed drug transactions in front of petitioner in the kitchen of petitioners' home.

On May 7, 1987, pursuant to a search warrant, Drug Enforcement Agency (DEA) agents and City of Philadelphia police officers conducted a search of petitioners' house. During the course of their search, the DEA agents and Philadelphia police officers found cash in the aggregate amount of $194,972. They also found jewelry worth $10,166, gambling chips worth $8,277.50, five firearms, fur coats, and assorted financial records.

On the following day, the DEA agents obtained search warrants to search two safe deposit boxes owned jointly by petitioner and Mr. DiMichele. The safe deposit boxes were located near the DiMicheles' home at First Pennsylvania Bank, 1444 W. Passyunk Avenue, in Philadelphia. In one safe deposit box, No. 402901, the DEA agents found cash in the amount of $225,000 and 10 gold coins, marked "Canada 999", each weighing 1 ounce. In the other safe deposit box, No. 301640, the agents found cash in the amount of $3,015 and jewelry worth $181,938.

The value of the jewelry found in petitioners' home and in safe deposit box No. 301640, in the aggregate amount of $192,104, was determined by an appraiser retained by the DEA agents.  We note that the same jewelry was valued by an appraiser retained by petitioners at $111,167.50.

At about the time of the Government's investigation into Mr. DiMichele's affairs, petitioners, either individually or jointly, maintained the following bank accounts:

| Bank Accounts/CD's | Account No. | Date | Joint | Petitioner | Mr. DiMichele | Total |
|---|---|---|---|---|---|---|
| Delaware Cash Reserve | 8-943701-2 | 6/25/87 | $2,181.13 | -- | -- | $2,181.13 |
| Delaware Cash Reserve | 8-943617-2 | 6/25/87 | -- | -- | $3,882.99 | 3,882.99 |
| Home Unity S & L | 21700884-8 | 6/30/87 | 4,546.12 | -- | -- | 4,546.12 |
| Home Unity S & L | 199015785 | 8/31/87 | 1,760.49 | -- | -- | 1,760.49 |
| Home Unity S & L | 1545-0112 | 9/17/87 | -- | $11,669.05 | -- | 11,669.05 |
| United Jersey Bank | 007006810 | 1/16/87 | 32,132.67 | -- | -- | 32,132.67 |
| United Jersey Bank | 03483922 | 2/88 | -- | -- | 2,261.58 | 2,261.58 |
| United Jersey Bank | 000-0028772 | 3/88 | -- | -- | 14,038.08 | 14,038.08 |
| United Jersey Bank | 9039271 | 5/86 | -- | -- | 8,668.19 | 8,668.19 |
| PSFS | 5-0531886 | 6/30/87 | -- | -- | 11,000.00 | 11,000.00 |
| Prudential S & L | 01-25000000916 | 8/31/87 | -- | [1]9,926.48 | -- | 9,926.48 |
| Beneficial S & L | 03-0188210 | 6/30/87 | -- | [2]2,729.58 | -- | 2,729.58 |
| Beneficial S & L | 03-54-49227 | 6/30/87 | -- | [2]2,919.63 | -- | 2,919.63 |
| | | | 40,620.41 | 27,244.74 | 39,850.84 | 107,715.99 |

1  Titled in petitioner's name as custodian for Mark Laudadio (petitioner's son).
2  Titled in petitioner's name as custodian for Christina DiMichele (petitioner's daughter).

In addition to the above accounts, petitioner and her husband maintained a checking account at First Pennsylvania Bank, account No. 298-643-8, that they had opened in 1978.  During the years in issue, petitioner wrote monthly checks from the account to pay the mortgage and certain household utilities, such as the telephone, electric, cable TV, and water.  During 1985 and 1986, checks totaling approximately

$4,913 and $4,358, respectively, were drawn from this account.

On April 15, 1983, petitioner opened an individual retirement account at United Jersey Bank in her name and deposited $500 into the account. Additional deposits of $2,000 were made into the account during each of the years in issue, 1985 and 1986. The balance of the account on April 30, 1994, was $8,150.52.

Similarly, on April 15, 1983, Mr. DiMichele opened an individual retirement account at United Jersey Bank and deposited $1,750 into the account. He made additional deposits of $2,000 into the account during each of the years in issue.

On May 31, 1984, petitioner opened a bank account under her maiden name, Eileen Secatore, at Home Unity Savings & Loan. She initially deposited $56,057.78, consisting of the insurance proceeds from the fire in petitioners' home in 1983. On May 11, 1987, petitioner and her husband withdrew $25,000 from the Home Unity account, and on June 16, 1987, they withdrew $33,000 more from the account. On June 18, 1987, petitioner opened an account at United Jersey Bank, in her maiden name, Eileen Secatore, and made an initial deposit of $33,000.

At about the time of the Government's investigation into Mr. DiMichele's affairs, petitioners owned the

following real property:

| Real Estate | Date | Mr. DiMichele | Petitioner | Joint | Total |
|---|---|---|---|---|---|
| 2010 S. 15th St. | 10/22/69 | -- | $12,000 | -- | $12,000 |
| 1533 Emily St. | 1981 | -- | -- | $16,168 | 16,168 |
| 1433 W. Passyunk Ave. | 05/83 | -- | -- | 60,000 | 60,000 |
| Trina Dr. | 12/11/85 | -- | -- | 8,500 | 8,500 |
| 1916-18 N. 5th St. | 05/10/85 | -- | -- | 32,000 | 32,000 |
| 1441 Shunk St. | 03/86 | -- | -- | 8,500 | 8,500 |
| 506, 508, 510 Fitzwater St. | 10/19/84 | $30,000 | -- | -- | 30,000 |
| | | 30,000 | 12,000 | 125,168 | 167,168 |

All of the above properties are located in Philadelphia, Pennsylvania.

Petitioner and her brother, William, had purchased the property at 2010 S. 15th Street, on October 22, 1969, for approximately $12,000. The house located on this property remained petitioner's primary residence after her marriage to Mr. DiMichele. At some time after 1969, petitioner obtained sole ownership of the property. In 1987, petitioner transferred the property back to her brother, Mr. William Secatore.

In 1981, petitioner and Mr. DiMichele purchased property at 1533 Emily Street for $16,168. They paid for the property with a cashier's check from United Jersey Bank. Thereafter, petitioner apparently acquired sole ownership of this property and, circa 1990, she transferred the property to her brother, Mr. William Secatore, for $1.

In May 1983, petitioner and Mr. DiMichele and Mr. and Mrs. Anthony DiMichele purchased property at 1433 W.

Passyunk Avenue for $120,000.  Part of the purchase price consisted of a cashier's check for $50,500 drawn from petitioners' United Jersey Bank account.  Petitioners held their interest in the property as tenants by the entirety. In 1990, petitioner's interest in the property was forfeited to the U.S. Government in connection with Mr. DiMichele's conviction on drug charges, as discussed below.

On October 19, 1984, Mr. DiMichele and Mr. Dennis G. Maryak purchased properties at 506, 508, and 510 Fitzwater Street for $30,000.  They sold these properties at the end of 1986 for $200,000.

On May 10, 1985, petitioner and Mr. DiMichele purchased property at 1916-18 N. 5th Street for $32,000. They paid for the property by check and did not finance any portion of the purchase.  At some time after they purchased the property, petitioner obtained sole ownership of it. Petitioner remained the owner of the property at the time of trial.

On December 11, 1985, petitioner and Mr. DiMichele purchased property located at Trina Drive for $8,500.  They paid for the property with a check in the amount of $10,000 that petitioner drew from her account at Home Unity Savings & Loan on December 4, 1985.  Petitioner and Mr. DiMichele sold the property in 1994 for $65,000.

In March 1986, petitioner and Mr. DiMichele purchased a one-third interest in property at 1441 Shunk Street for $8,500. The other owners of the property were Tito Vespasiano and Angel Giancoma, petitioner's cousin. Petitioners' interest in the property was forfeited to the U.S. Government in 1990 in connection with Mr. DiMichele's conviction on drug charges, as discussed below.

At the time of the Government's investigation into Mr. DiMichele's affairs, petitioner and her husband owned two cars. Petitioner owned a 1981 Lincoln Continental that she and her husband had purchased in March of 1981 for $16,200. In purchasing this car, they had made a down-payment of $6,200 and had financed the balance of $10,000 through the Fidelity Bank & Trust Co. of New Jersey over 4 years with monthly installments of $280.84. The Credit Application and the Purchase Money Motor Vehicle Security Agreement that were signed by petitioner and her husband and submitted to Fidelity Bank & Trust Co. of New Jersey list petitioner's address as "406 Orchard Ave Somerdale, NJ 08083." Similarly, the Certificate of Ownership of a Motor Vehicle issued in petitioner's name by the New Jersey Division of Motor Vehicles lists the same address.

The second car was a 1984 Cadillac Eldorado that Mr. DiMichele had purchased in December 1983 for $25,678.57. In purchasing that car, Mr. DiMichele had made

a $7,000 downpayment, and he had received an allowance of $5,000 for trading in a 1979 Dodge Regis. He financed the balance, $13,678.57, through a loan with Fidelity Bank & Trust Co. payable over 4 years with monthly installments of $367.31.

Mr. DiMichele was indicted by a Federal grand jury on February 17, 1988, for conspiring to distribute methamphetamine, in violation of 21 U.S.C. sections 841 and 846, (count 1), for distribution of methamphetamine, in violation of 21 U.S.C. section 841(a)(1) (counts 2 and 3), and for possession of an unregistered firearm in violation of section 5861(d) (count 4). Count 5 of the indictment alleges that the currency, jewelry, bank accounts, and real property owned by petitioners had been used to facilitate the commission of the crimes charged in the indictment and were subject to forfeiture under 21 U.S.C. section 853.

On March 16, 1988, the grand jury approved a superseding indictment that added three criminal tax violations to the other criminal violations charged in the original indictment. The new counts charged Mr. DiMichele with willfully making and subscribing false income tax returns for 1983 (count 6), 1984 (count 7), and 1985 (count 8), in violation of section 7206(1).

Mr. DiMichele pled guilty to counts 1 and 8 of the superseding indictment. As to count 1, Mr. DiMichele was

sentenced to serve 10 years in jail and to pay a fine in the amount of $25,000. As to count 8, he was sentenced to serve 2 years in jail, to run concurrently with the sentence imposed on count 1.

At approximately the same time that Mr. DiMichele was sentenced, December 22, 1988, the District Court entered an Order of Forfeiture under which it ordered Mr. DiMichele to forfeit all of the property listed in the indictment. Thereafter, on February 17, 1989, petitioner filed Forfeiture Claim Of Eileen DiMichele in which she claimed ownership of the Lincoln Continental automobile, bank accounts, real estate, and jewelry. The court entered its Final Order of Forfeiture on January 24, 1990. Set out below is a summary of the assets listed by the District Court in its original order of forfeiture dated December 19, 1988, the assets claimed by petitioner in her Forfeiture Claim of Eileen DiMichele filed February 17, 1989, the assets listed in the Final Order Of Forfeiture filed on January 24, 1990, and the assets that were not forfeited:

| Cash and Jewelry | Date | Assets | Claimed by Petitioner | Forfeited | Not Forfeited |
|---|---|---|---|---|---|
| Cash found at 2010 South 15th St. | 05/07/87 | $194,972.00 | | $194,972.00 | |
| Casino chips found at 2010 South 15th St. | 05/07/87 | 8,277.50 | | 8,277.50 | |
| Cash found in safe deposit box 402901 | 05/08/87 | 225,000.00 | | 225,000.00 | |
| Ten gold Canadian coins in box 402901 | 05/08/87 | | | | |
| Jewelry found in home and safe deposit box | 05/08/87 | 111,167.50 | $92,237.30 | 71,046.80 | $40,120.70 |

## Bank Accounts and CD's

| | | | | | |
|---|---|---|---|---|---|
| Delaware Cash Reserve 8-943701-2 | 06/25/87 | 2,181.13 | 2,181.13 | 2,181.13 | |
| Delaware Cash Reserve 8-943617-2 | 06/25/87 | 3,882.99 | | 3,882.99 | |
| Home Unity S & L  217000884-8 | 06/30/87 | 4,546.12 | 4,546.12 | | 4,546.12 |
| Home Unity S & L 199015785 | 08/31/87 | 1,760.49 | 1,760.49 | | 1,760.49 |
| Home Unity S & L 1545-0112 | 09/17/87 | 11,669.05 | 11,669.05 | | 11,669.05 |
| United Jersey Bank 007006810 | 01/16/87 | 32,132.67 | 32,132.67 | | 32,132.67 |
| United Jersey Bank 03483922 | 02/88 | 2,261.58 | | 2,261.58 | |
| United Jersey Bank 000-0028772 | 03/88 | 14,038.08 | | | 14,038.08 |
| United Jersey Bank 9039271 | 05/86 | 8,668.19 | | | 8,668.19 |
| PSFS 5-0531886 | 06/30/87 | 11,000.00 | | 11,000.00 | |
| Prudential S & L 01-25000000916 | 08/31/87 | 9,926.48 | 9,926.48 | | 9,926.48 |
| Beneficial S & L 03-0188210 | 06/30/87 | 2,729.58 | 2,729.58 | | 2,729.58 |
| Beneficial S & L 03-54-49227 | 06/30/87 | 2,919.63 | 2,919.63 | | 2,919.63 |

## Real Estate

| | | | | | |
|---|---|---|---|---|---|
| 2010 South 15th Street | 10/22/69 | 12,000.00 | 12,000.00 | | 12,000.00 |
| 1533 Emily Street | 1981 | 16,168.00 | 16,168.00 | | 16,168.00 |
| 1433 West Passyunk Ave. | 05/83 | 60,000.00 | 60,000.00 | 60,000.00 | |
| Trina Drive | 12/11/85 | 8,500.00 | 8,500.00 | | 8,500.00 |
| 1916-18 North 5th Street | 05/10/85 | 32,000.00 | 32,000.00 | | 32,000.00 |
| 1441 Shunk Street | 03/86 | 8,500.00 | 8,500.00 | 8,500.00 | |
| 506, 508, 510 Fitzwater Street | 10/19/84 | 30,000.00 | | | 30,000.00 |

## Automobiles

| | | | | | |
|---|---|---|---|---|---|
| 1981 Lincoln Continental | 03/81 | 16,200.00 | 16,200.00 | 16,200.00 | |
| 1984 Cadillac Eldorado | 12/83 | 25,678.57 | | | 25,678.57 |
| | | 856,179.56 | 313,470.45 | 603,322.00 | 252,857.56 |

Before Mr. DiMichele began serving his prison term, he gave approximately $40,000 to petitioner. Since Mr. DiMichele's release from prison, he has lived with petitioner. Petitioner filed a Complaint in Divorce on April 29, 1994, but no further action has been taken, and petitioner and Mr. DiMichele continue to live together in the house located at 2010 South 15th Street.

Respondent issued two notices of deficiency to petitioners, one for 1985 and one for 1986. The principal adjustment made by respondent to the DiMicheles' 1985 income tax return was to increase the gross income reported on the return by $720,000, the amount respondent determined that Mr. DiMichele had received from the sale of drugs during 1985, and to allow a deduction of $180,000 for the cost of drugs sold during the year. For the year 1986, respondent made two adjustments. Respondent increased the DiMicheles' gross income by $34,000, the amount of the long-term capital gain realized from the sale of the properties located at 506, 508, and 510 Fitzwater Street, and increased petitioners' gross income by $31,748, the amount of unreported bank deposits during the year.

OPINION

The sole issue for decision is whether petitioner qualifies as an "innocent spouse" under section 6013(e), and is thereby relieved of joint and several liability for the tax and additions to tax determined by respondent with respect to joint tax returns that petitioner filed with Mr. DiMichele for 1985 and 1986. Section 6013(e)(1) relieves a spouse of liability with respect to a joint Federal income tax return if each of the following four requirements is met:

> (A) a joint return has been made under this section for a taxable year,
>
> (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,
>
> (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and
>
> (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement.

Petitioner bears the burden of proving that each

of the above requirements is satisfied.  Rule 142(a).  All Rule references are to the Tax Court Rules of Practice and Procedure.  Failure to prove any one of the above requirements precludes the taxpayer from qualifying as an "innocent spouse".  Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

Respondent concedes that petitioner meets the first two requirements of the test with respect to both of the tax returns in issue.  Therefore, petitioner must prove that she meets the remaining two requirements; i.e., that she had no knowledge nor reason to know about the substantial understatements, sec. 6013(e)(1)(C), and, taking into account all facts and circumstances, that it would be inequitable to hold her liable for the deficiency in tax attributable to the substantial understatement for the year, sec. 6013(e)(1)(D).

For the year 1985, the substantial understatement of tax is attributable entirely to respondent's determination that petitioners failed to report the income and expenses from Mr. DiMichele's activity as a drug dealer.  For the year 1986, the understatement of tax is attributable to

two items, each of which is "substantial". See sec. 6013(e)(3). The first item is respondent's determination that petitioners failed to report gross income of $31,748, computed using the bank deposits method of computing income. The second item is respondent's determination that Mr. DiMichele "realized a long-term capital gain of $34,000.00 from the sale of 506 and 510 Fitzwater."

To satisfy section 6013(e)(1)(C), petitioner must prove that in signing each of the returns in issue she did not know, and had no reason to know, that there was a substantial understatement of tax attributable to the grossly erroneous items of her husband. See Purcell v. Commissioner, 86 T.C. 228, 236 (1986), affd. 826 F.2d 470 (6th Cir. 1987). This is a question of fact to be determined after considering all available facts and circumstances. E.g., Flynn v. Commissioner, 93 T.C. 355, 365 (1989).

Petitioner argues that in signing her joint returns for 1985 and 1986 she did not know, and had no reason to know, that there was a substantial understatement of tax on either of the returns. She argues that she has limited

education and no formal training in finance or accounting. She also argues that, during the years in issue, she had limited involvement in the financial affairs of the family and that she and her husband made "no unusually lavish expenditures * * * when compared to their past levels of income, standard of living and spending pattern." Petitioner emphasizes that she was not involved in any way in her husband's illegal activities, and she notes that the Government's investigation of her husband did not implicate her in any illegal activity. Finally, she argues that the testimony of Mr. Michael Madgin, a Government informant, is incredible and should be disregarded.

We find that petitioner did not meet her burden of proving that she did not know, and had no reason to know, that there was a substantial understatement of tax on her joint returns for 1985 and 1986. There is ample evidence from which we infer that petitioner knew of Mr. DiMichele's illegal drug business and, hence, knew or should have known of the substantial understatements of tax in 1985 and 1986, which were attributable to the unreported income from that business. The record shows that Mr. DiMichele

conducted his criminal activities in his home.  He held business meetings there, he collected and stored hundreds of thousands of dollars there, and he maintained his business records there.  It is undisputed that petitioner greeted Mr. DiMichele's business associates when they came to the home for meetings with Mr. DiMichele.  There is also persuasive evidence in the form of testimony by one of Mr. DiMichele's business associates, Mr. Michael Madgin, that at least one meeting took place in petitioner's presence during which Mr. DiMichele, Mr. Madgin, and another person counted money and discussed illegal drug activities.  We also credit Mr. Madgin's testimony that he delivered to petitioner a payment of cash in the amount of $50,000 to $100,000 for Mr. DiMichele.

Furthermore, there is ample evidence that petitioner was aware of the fruits of her husband's illegal drug activities and, hence, knew or should have known of the substantial understatements of tax attributable to unreported income in both 1985 and 1986.  The investigation conducted by the DEA agents in 1987 and their searches of petitioners' home and safe deposit boxes revealed that the

couple owned two cars, furs, $419,972 in cash, jewelry, valued by petitioners at $111,167.50, and various parcels of real estate.

During each of the years in issue, petitioner knew that she and her husband had purchased the 1981 Lincoln Continental for $16,200, that they had made a cash down-payment of $6,200, and that they had borrowed the balance of $10,000 from Fidelity Bank & and Trust Co. of New Jersey. She knew that the car was titled in her name and she had executed the Credit Application and the Purchased Money Motor Vehicle Security Agreement submitted to the lender, Fidelity Bank & Trust Co. of New Jersey. She also knew or should have known that the cost of the 1981 Lincoln was more than 58 percent of the total income reported on petitioners' 1981 return.

Similarly, petitioner knew that her husband had purchased a new Cadillac Eldorado in December 1983. The record of this case does not include the purchase documents for the Cadillac which cost $25,400. Never-theless, petitioner knew or should have known that the Cadillac Eldorado was a relatively expensive car to

purchase for a couple whose total wages for the year were $26,000.

Petitioner knew of the fur coats that were photographed but not confiscated by the DEA agents who conducted the search of the DiMicheles' home. Petitioner testified that the fur coats "were really old * * * antiques, really." However, she provided nothing to substantiate that testimony.

Petitioner knew of the jewelry found in her home by the DEA agents, and she knew of the jewelry found by the agents in safe deposit box No. 301640. According to petitioners' valuation, all of the jewelry was worth $111,167.50. On the other hand, the Government's appraiser valued the jewelry at $192,104. Even if we accept petitioners' valuation, it is difficult to reconcile a jewelry collection valued at more than $110,000 with the total income reported on the joint returns filed by petitioner and her husband.

Petitioner's brief claims: "Any jewelry that she possessed was either purchased during the earlier stages of the marriage, received as gifts or inherited as

heirlooms."  At trial, petitioner testified about the jewelry contained in safe deposit box No. 301640 as follows:

> Q        Now, let's talk for a minute about the jewelry.
> The jewelry that was in the safety deposit box were pieces of jewelry that you did not wear on a regular basis?
>
> A        That's correct.
>
> Q        Okay.  Describe for His Honor how you came into possession of those pieces of jewelry.  Were they gifts?
>
> A        Yes, a lot of these things were sentimental things; they were heirlooms that were passed down from my grand-mother, who I had taken care of over the years.  She had heart pins and her necklace and her jewelry that I was given to -- given to me.  And my mother had passed away.  I had my mother's jewelry also in there.

Based upon that testimony, petitioner asks the Court to find the following as facts:

> 38.  Petitioner did use the safe deposit box which contained her jewelry.
>
> 39.  Petitioner came into these pieces of jewelry through gifts and inherited as family heirlooms from her mother and grandmother.

We have several difficulties with petitioner's testimony. First, on two occasions, respondent propounded the following interrogatory to petitioner and her husband:

> 78. Indicate all inheritances that the petitioners or their children received in their lifetime. Also if applicable, indicate the following:
>
>> (a) Who the inheritance was left to;
>>
>> (b) Who the inheritance was left from;
>>
>> (c) Indicate the approximate value of the inheritance and the date that it was received;
>>
>> (d) Indicate if an inheritance tax return was ever filed. If applicable, indicate the date and location of where it was filed;
>>
>> (e) If an inheritance tax return was not filed explain why;
>>
>> (f) Indicate the exact asset that was gifted. i.e. cash, property, jewelry etc.

In response to both interrogatories, petitioner and her husband responded, "No".

Second, petitioner's testimony about the jewelry is

contradicted by her husband's testimony during which he never mentioned any jewelry that was inherited from petitioner's mother or grandmother.  Rather, in reviewing petitioner's appraisal of the jewelry, he testified that he had acquired the jewelry over a period of many years.  He testified as follows:

> Q        Again, describing the jewelry that
>          is contained in this appraisal, these were
>          various items that you acquired over the
>          years?
>
> A        That's correct.

Petitioner knew that her husband had collected and stored large amounts of cash in their home.  One of Mr. DiMichele's criminal conspirators, Mr. Madgin, testified that from time to time he delivered large amounts of cash, anywhere from $25,000 to $100,000, to Mr. DiMichele at petitioners' home.  Mr. Madgin also testified that in 1985, he delivered a brown bag containing approximately $50,000 to $100,000 in cash to petitioner in her husband's absence.  Mr. Madgin also testified credibly that on one occasion, he discussed drug transactions with Mr. DiMichele and another person and they counted money at

the kitchen table of petitioners' home while petitioner was present in the kitchen.

Furthermore, the DEA agents who searched petitioners' home found cash throughout the house. They found $136,000 in the rear basement closet, an area of the house that petitioner claimed she could not enter. However, they also found $2,681 in the basement closet where the fur coats were found, $2,652 in a dining room closet, along with financial records, $23,850 in a playroom closet, and $26,917 in the master bedroom. The agents also found $3,015 in safe deposit box No. 301640, the box where petitioner stored her jewelry.

Based upon the above, we find that petitioner has failed to prove that she did not know, and had no reason to know, of the substantial understatement of tax in 1985, which was attributable to Mr. DiMichele's illegal drug business. Concomitantly, we find that petitioner has also failed to prove that she did not know, and had no reason to know, of the substantial understatement of tax in 1986 computed by respondent using the bank deposits method.

The only other issue we must decide is whether

petitioner knew or had reason to know of the substantial understatement of tax in 1986 attributable to the unreported gain from the sale of the 506, 508, and 510 Fitzwater Street properties.  During petitioner's testimony at trial, she made no specific reference to the 506, 508, and 510 Fitzwater Street properties.  Rather, she testified that she had no involvement in the purchase of any of the properties acquired by the couple.  Her testimony is as follows:

> Q  All right, You heard Carl describe the various properties that were purchased beginning in 1981, going forward.  Tell His Honor your involvement in purchasing or any aspect of those properties.  What was your involvement in those?
>
> THE WITNESS:  Well, I really had no involvement, Your Honor.  As far as things went, as purchasing of all the property, I left that all up to my husband because he was the one that had the talent to do all those things and I just didn't understand if he bought something or maybe he was selling something or he fixed a building or he would resell it, and I just never knew what was going on at that time.

Similarly, in her post-trial brief, petitioner does not specifically deny that she knew of the Fitzwater

Street properties or of the sale of those properties on December 30, 1986.  The only reference to the properties in petitioner's post-trial briefs is the following objection to one of respondent's proposed findings of fact:

> [The] Notice of deficiency issued to Petitioners on March 19, 1990 does not take into consideration that Petitioner-Wife had no ownership interest in the Fitzwater Street property and that petitioner-Husband did not receive any actual cash on December 30, 1986 and after deducting the cost for the property, husband only received $11,700 which was his half of the profit with his partner.

We cannot accept petitioner's denial of "involvement in purchasing or any aspect of" the Fitzwater Street properties to mean that she did not know or have reason to know of the gain from the sale of those properties on December 30, 1986.  On that basis alone, we find that petitioner failed to meet her burden of proof under section 6013(e)(1)(C).  Furthermore, petitioner's testimony that she relied on her husband concerning the purchase and sale of real property is not sufficient to satisfy the lack of knowledge requirement of section 6013(e)(1)(C).  The innocent spouse exemption was not intended to protect a

spouse who turns a blind eye to whether there is a substantial understatement of tax on a joint return. Bokum v. Commissioner, 94 T.C. at 148.

For the reasons discussed above, we find that petitioner does not meet the requirements of section 6013(e)(1)(C).  Accordingly, petitioner is not entitled to the relief provided by section 6013.  It is unnecessary for us to consider petitioner's arguments under section 6013(e)(1)(D).

Additions to Tax for Fraud

Respondent determined that Mr. DiMichele is liable for the additions to tax for fraud pursuant to section 6653(b)(1) and (2) with respect to the underpayment of tax for 1985.  However, as mentioned above, respondent does not allege fraud by petitioner.  Accordingly, petitioner is not liable for the additions to tax for fraud determined by respondent with respect to petitioner's joint return for 1985.

For the foregoing reasons,

Decisions will be entered

for respondent, except as to

petitioner's liability for the addition to tax for fraud.

Excess:
This income was unreported and resulted in the conceded deficiencies in petitioners' Federal income tax as detailed above.  The calculation of petitioners' income was accomplished using evidence seized in a search of petitioners' home in Philadelphia.  For 1985, respondent determined that Mr. DiMichele had gross receipts from the sale of drugs in the amount of $720,000, less cost of goods sold in the amount of $180,000 and a two-earner deduction in the amount of $1,876.[S8]  For 1986, the increase was the result of respondent's determination through use of the bank deposits method of an unreported $34,000 capital gain and unreported additional income of $31,748.[S9]

The taxable income stated on the DiMicheles' income tax returns was as follows:

| Year | Adjusted Gross Income |
|------|------------------------|
| 1985 | $36,696 |
| 1986 | $23,683 [Ex.1,2] |

On October 17, 1988, Mr. DiMichele pleaded guilty to the possession and distribution of methamphetamine in the U.S. District Court for the Eastern District of Pennsylvania.  He was sentenced to 10 years imprisonment [E11] and served time in prison from January 1989 to May 1993 when he was released on parole.  Mr. DiMichele was also fined $25,100.  The first 1st count which Mr. DiMichele pled guilty to states that from 1981 through 1987, Mr. DiMichele sold methamphetamine to Michael Madgin, another drug distributor.  [T246-247]

    a. Delaware Cash Reserve
        Account #8-943701-2
        Titled in name of Carl & Eileen DiMichele
        (Balance as of 6/25/87: $2,181.13)

    b. Home Unity Savings & Loan
        Account #21700884-8
        Titled in name of Carl & Eileen DiMichele
        (Balance as of 6/30/87: $4,546.12)

Account #199015785
Titled in name of Carl & Eileen DiMichele
(Balance as of 8/31/87: $1,760.49)

Account #1545-0112
Titled in name of Eileen Secatore
(Balance as of 9/17/87: $11,669.05)

c. United Jersey Bank
Account #007006810
Titled in name of Carl & Eileen DiMichele
(Balance as of 1/16/87: $32,132.67

e. Prudential Savings & Loan
Account #01-25000000916 IRA)
Titled in name of Eileen DiMichele as
custodian for Christina DiMichele
(Balance as of 6/30/87: $2,729.58)

Account #03-54-49227
Titled in name of Eileen DiMichele as
custodian for Christina DiMichele
(Balance as of 6/30/87: $2,919.63)


Section 6013(a) provides that a husband and wife may file a single return jointly. If they elect to do so, the tax is computed on the aggregate income of both spouses, and the liability with respect to the tax is joint and several. Sec. 6013(d)(3). Liability will therefore attach to a spouse who was "innocent" of deficiencies resulting from an erroneous omission or deduction solely attributable to one spouse. In 1971, Congress enacted the "innocent spouse" provision to remedy this inequity and to protect one spouse from the overreaching or dishonesty of the other. Stiteler v. Commissioner, T.C. Memo. 1995-279.

**[The following two paragraphs are written for use if the opinion is formulated without a discussion of the (e)(1)(C) knowledge element of the innocent spouse test]**
Where the court finds that it would not be inequitable to hold a putative innocent spouse liable for income tax on

a joint return, it will often not even address the element of knowledge under section 6013(e)(1)(C).  See <u>Purificato v. Commissioner</u>, <u>supra</u> at 292; <u>Estate of Krock v. Commissioner</u>, <u>supra</u> at 677; <u>Stiteler v. Commissioner</u>, T.C. Memo. 1995-279.  Under this analysis, since petitioner must prove all of the elements under section 6013(e)(1) to prevail, the failure to prove any one of these elements will preclude innocent spouse relief.  It is reasoned that if the taxpayer cannot meet the burden of proving that it would be inequitable to hold her liable, then no other element of the test need be addressed.

We adopt this mode of analysis.  Petitioner has failed to meet her burden of showing that, under all of the facts and circumstances, it would be inequitable to hold her liable for the tax owing on the joint income tax returns filed together with her husband.  We therefore express no opinion with respect to petitioner's knowledge of the circumstances surrounding the subject deficiencies.  We find that petitioner may not be relieved of liability for the subject deficiencies under the innocent spouse provision of the Internal Revenue Code.

**[Although respondent does not allege fraud, I have included an exploration of the issue as follows:]**

In addition to determining petitioner's liability for the assessed deficiencies, we must determine whether petitioner is also liable for the asserted additions to tax for fraud.  Under section 6653(b)(4), a spouse is liable for the fraud addition on the couple's joint return if that spouse also committed fraud.  On this issue, respondent bears the burden of proof.  <u>Stone v. Commissioner</u>, 56 T.C. 213, 227 (1971).  Fraud is not imputed from one spouse to another, and in the case of a joint return, as here, respondent must prove fraud on the part of each spouse.  Sec. 6653(b).  (Now section 6663(c); <u>Hicks Co. v. Commissioner</u>, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); <u>Stone v. Commissioner</u>, <u>supra</u> at 227-228.

For purposes of section 6653(b), fraud means the intentional commission of an act or acts for the specific

purpose of evading a tax believed to be owing, <u>Webb v. Commissioner</u>, 393 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; <u>McGee v. Commissioner</u>, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Respondent must prove that there was an underpayment, <u>Parks v. Commissioner</u>, 94 T.C. 654, 660 (1990), and that the taxpayer intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent tax collection. <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004-1005 (3d Cir. 1968); <u>Parks v. Commissioner</u>, <u>supra</u> at 661; <u>Rowlee v. Commissioner</u>, T.C. 1111, 1123 (1983).

The first element, the existence of an understatement of income is met. Both parties acknowledge the understatement of tax liability for the years in issue.

With respect to proof of fraudulent intent on the part of petitioner, respondent has not satisfied its burden. The evidence set forth by respondent aims at exposing petitioner's knowledge of the circumstances of Mr. DiMichele's drug activities. However, nothing submitted by respondent purports to prove petitioner's fraudulent intent to evade income taxes. Although petitioner did sign the fraudulent income tax return, we find no act committed with the specific purpose of evading income tax. The record shows that petitioner's behavior was not focused upon committing fraud. By requiring a showing of intent, the legal standard requires more than simply a general knowledge of the circumstances. An examination of the evidence on the record leaves us with little awareness of petitioner's intentions. Petitioner was not involved with the couple's record keeping firsthand. Mr. DiMichele handled the couple's finances, with the exception of the monthly checks for expenses written by petitioner. Respondent has pointed to no single activity which would lead us to believe that petitioner deliberately misled the taxing authorities.

In a similar case involving the wife of a drug trafficker, the Court wrote:

The mere fact that [the wife] was aware of her

husband's activities at the time she signed the return does not change the result.  We will not infer intent to evade tax from her passive knowledge.  [Congelliere v. Commissioner, T.C. Memo. 1990-265.]


In Congelliere, moreover, the wife clearly had actual knowledge of her husband's activities when the tax return was signed, since her husband had already been arrested for drug trafficking.  Although she was denied innocent spouse relief, the Court held that the wife was not liable for fraud.


The cash was found in various parts of the house, $23,850 in the playroom closet, $2,652 in the dining room, $26,917 in the master bedroom, and $136,000 in the basement closet. The agents and police


Despite the fact none of the insurance proceeds were used toward renovating petitioners' home, petitioners managed to renovate their home using other funds.

A portion of the total the purchase price for the property was designated for the real estate and part was designated for a business to be operated at the property.  [S54]

[T201-202]
On December 19, 1988, an order of forfeiture was issued in Mr. DiMichele's criminal case.  The order called for the seizure of all of Mr. DiMichele's assets. Following the District Court's Order of Forfeiture, petitioner filed a Forfeiture Claim on February 17, 1989, which declared ownership in all jointly and individually held bank accounts, all real estate listed, other than that claimed by Mr. DiMichele's counsel, and jewelry worth at least $91,287 (based on petitioner's appraisal).  [Ex.19] In the District Court's Final Order of Forfeiture on January 24, 1990, jewelry worth an appraised value of $40,120 (based on petitioner's appraisal) was returned to

Mrs. DiMichele.  Of the bank accounts owned jointly by petitioners, the Delaware Cash Reserve Account #8-943701-2 was ordered to be forfeited.  The property at 1433 W. Passyunk Avenue was ordered forfeited as well as the DiMicheles' interest in the 1441 Shunk Street property. The remaining joint and individually held accounts of petitioner were retained by petitioner.  All cash found at petitioners' residence and in the safe deposit boxes was forfeited.  The Cadillac apparently remained in petitioner's possession.  [Ex.20]  All other jointly and individually held property not ordered forfeited remained in petitioner's possession.

Under section 6013(e)(1)(D), petitioner must prove that, taking into account all of the facts and circumstances of the case, it would be inequitable to hold her liable for the tax deficiency attributable to her spouse.  Sec. 16.6013-5(b), Income Tax Regs.  Factors to be considered are:  (i) Whether the spouse claiming relief significantly benefitted from the grossly erroneous items attributable to the culpable spouse, Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989); and (ii) whether the spouse claiming relief has been deserted by or divorced or separated from the culpable spouse.  Id. at 678; section 1.6013-5(b), Income Tax Regs.

In determining whether a putative innocent spouse significantly benefitted from the grossly erroneous items attributable to the culpable spouse, we look to whether the spouse claiming relief significantly benefitted beyond normal support, either directly or indirectly, from the erroneous items.  Belk v. Commissioner, 93 T.C. 434, 440 (1989); Parcel v. Commissioner, 86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987); section 1.6013-5(b), Income Tax Regs.

The regulations further state that:

Evidence of direct or indirect benefit may consist of transfers of property, including transfers which may be received several years after the year in which the omitted item of

income should have been included in gross income. Thus, for example, if a person seeking relief receives from his spouse an inheritance of property or life insurance proceeds which are traceable to items omitted from gross income by his spouse, that person will be considered to have benefitted from those items.  Sec. 1.6013-5(b) Income Tax Regs.

The comparative "level" of lifestyle that a taxpayer leads before and after enjoying the benefits of the tax understatement is not controlling.  Stated another way, present consumption is not required.  Acquisition of property and contributions to investments and savings may all be construed as significant benefits which the spouse enjoys.  Purificato v. Commissioner, 9 F.3d 290 (3d. Cir. 1993); see also Estate of Krock v. Commissioner, 93 T.C. 672 (1989).

Petitioner did not live a lavish lifestyle during the years at issue.  However, we find that petitioner benefitted significantly from the understatements or the items underlying them.  The evidence shows that petitioner acquired real property, contributed substantial funds to bank accounts, and amassed a large jewelry collection. Petitioner did not rebut this evidence by demonstrating a source of funds separate from those arising from the tax understatement.  The burden of showing the source of funds for property received is on the taxpayer.  Tertian v. Commissioner, 72 T.C. 1164 (1979).  Petitioner has not shown us an alternative source of funds for the benefits she received.

The purchase of real property is a benefit.  Schlosser v. Commissioner, T.C. Memo. 1992-233, affd. 2 F.2d 404 (11th Cir. 1993).  During 1985 and 1986, petitioner acquired, along with her husband, two real property interests for $32,000 and $8,500, respectively.  Payments were ostensibly also being made on the 1433 W. Passyunk Avenue property purchased by the DiMicheles for $120,000 in 1983.

During the years at issue, petitioner had $4,000 deposited into her IRA account.

Petitioner withdrew large sums from the Home Unity bank account. This money came from insurance proceeds received after petitioners' house was damaged by fire that had been deposited directly in the Home Unity account. Renovations must have been accomplished with other money since the insurance money remained in the bank while renovations were performed on the house. Petitioner did not show us any alternative source of funds for these renovations. We therefore infer that such funds were traceable to the understatements or the items underlying the understatements. [R's brief, p. 52]

Petitioner maintained six other bank accounts either jointly with Mr. DiMichele or individually. Petitioner has made no showing as to the source of the funds in these accounts.

During the years at issue, payments of $367.31 were made or the debt was retired in some way on a Cadillac purchased by the DiMicheles in 1983. The purchase of the Cadillac and the use of the vehicle constitutes a benefit to petitioner.

Petitioner testified that when Mr. DiMichele began his prison term, he gave petitioner approximately $40,000 to live on while he was incarcerated. Petitioner claims this constituted normal support. In Estate of Krock, a wife claiming innocent spouse relief was deemed to have benefitted beyond normal support by carrying out a unique and unusual lifestyle. The wife had joined her husband who fled to the Bahamas as a fugitive from justice. She claimed that since life in exile was a source of unhappiness, any benefit received during this period should not be considered anything above normal support. In rejecting this argument, the Court observed that her ability to maintain life abroad with her husband who was avoiding arrest and trial could not be described as "normal support." Estate of Krock, supra at 684. Similarly, petitioner's receipt of a large amount of cash to live on while her husband was in jail constitutes an unusual

benefit, which transcends "normal" support.  During her husband's incarceration, petitioner worked only during the years 1989 and 1990.  No other evidence is provided to show a source of financial support for the balance of the time.  Petitioner has failed to demonstrate that there was no nexus between the tax understatements or the items underlying the understatements and Mr. DiMichele's $40,000 cash gift.

As to petitioner's argument that her "middle class" lifestyle did not change and was not lavish, this is not the focus of the inquiry.  As stated previously, present consumption is not required in determining whether a taxpayer has significantly benefitted from a tax understatement.  Moreover, petitioner would have had to present specific documented patterns of spending to show that there had been no change in order to meet her burden.  See Estate of Krock, supra at 679-680.

The policy behind this rule is set forth in the recent case of Purificato, where the court writes:

> Furthermore, we cannot believe that Congress, in enacting sec. 6013(e)(1)(D), intended to require the kind of investigations and trials that would be needed if entitlement to "innocent spouse" relief depended on facts and circumstances of this type.  For example, we do not think that Congress wanted to require the IRS to investigate whether the Purificato couples ever went out to dinner, to the movies, or to a ballgame.  Nor do we think that Congress wanted to require the tax court to conduct a trial and make findings on such questions.  Purificato, supra at 296.

A taxpayer derives a benefit from the use of ill-gotten funds even if they are unaware that the funds are tainted. Turner v. Commissioner, T.C. Memo. 1988-339.  Thus, the element of knowledge does not enter the inquiry into whether petitioner significantly benefitted from the tax under-statements.

Pursuant to the regulations, we also look to transfers of property in years following the years at issue. Sec. 1.6013-5(b). In 1994, the Trina Drive property, which was purchased in 1985, was sold for $64,000. Originally purchased jointly by the DiMicheles, title had been transferred to petitioner exclusively after Mr. DiMichele's incarceration. Thus, petitioner personally received all of the proceeds from the sale, which constitutes a benefit to petitioner.

Petitioner has demonstrated no current source of income or financial support, so we assume that her living money is still coming out of her and her husband's accumulated assets. We therefore infer that she is still benefitting from the use of money traceable to the tax understatements resulting from unreported income earned in the tax years at issue.

Petitioner, furthermore, retained a substantial portion of the couple's assets when Mr. DiMichele was sent to prison. All assets which petitioner claimed and that were not forfeited to the Federal Government were retained by petitioner.

It is noted that subsequent to Mrs. DiMichele's filing for divorce in April, 1994, no further action has been taken and Mr. DiMichele continues to live at petitioner's residence in Philadelphia. This factor therefore will be accorded no weight in the 6013(e)(1)(D) determination.

Moreover, in light of the foregoing discussion and of other evidence, we conclude that petitioner did have knowledge of the circumstances surrounding the tax understatements, satisfying section 6013(e)(1)(C). In thus concluding, we credit the testimony of Mr. Madgin. Mr. Madgin testified that he had discussed drug transactions in petitioner's presence on at least one occasion. He also testified that petitioner had been involved in a drug transaction when he delivered to her a bag of cash to give to her husband. We find that petitioner was intelligent and competent. Petitioner's knowledge of her husband's drug activities was coupled with

her awareness of all the benefits accruing from these activities as discussed above.  Petitioner therefore must have had direct knowledge of the drug activities when she signed the joint income tax returns.

Partial Liability Predicated on Partial Knowledge
        Petitioner asks the Court to hold petitioner liable for only so much of the deficiency as she was aware of.  This argument is based on the court's holding in Ratana v. Commissioner, 662 F.2d 220 (4th Cir. 1981).  There, the court found that a wife seeking "innocent spouse" relief was liable for only that tax attributable to the unreported income of which she had actual or constructive knowledge but that she was entitled to "innocent spouse" relief as to the rest of the unreported income.  Id. at 225.  See Purificato, supra at 297.  Given the evidence provided in the record, however, we conclude that we do not have information specific enough to make such a determination.  We, therefore, find Ratana inapposite.  Since it is factually distinguishable, we do not have occasion to discuss the application of the methodology used in Ratana.

|  | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|---|---|
| Schedule C General Sign Co. | $3,925 | $18,809 | | | | | | | |
| Wages-- General Sign Co. | | | 1,200 | $28,700 | $4,000 | | | | |
| Wages--Out of the Past, Inc. | | | | | | | | | |
| Mr. DiMichele | | | | | $18,000 | $26,000 | $19,500 | $2,400 | |
| Petitioner | | | | | | | 6,500 | 23,400 | |
| Installment sale of business | | | | | | | | | |
| Capital | | | | 8,658 | 380 | 363 | 11,726 | | |
| Oridinary | | | | 4,906 | 215 | 206 | 3,472 | | |
| Capital Gain | | | | | | | | | $6,175 |
| Schedule E Vacant property | | | | (171) | | | | | |
| 1533 Emily | | | | | | | (1,243) | (1,996) | (1,846) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| N. 5th St., Commercial Bldg. | | | | | | | | 5,070 | 9,605 |
| 1441 Shunk | | | | | | | | | (343) |
| 1433 Partnership | | | | | | | (5,208) | (2,899) | (1,245) |
| Interest | | | 140 | 10,113 | 11,921 | 11,311 | 14,920 | 16,925 | 11,200 |
| Dividends | | | | | | 18 | 62 | 77 | 137 |
| Total income | 3,925 | 20,009 | 28,840 | 27,506 | 30,516 | 37,898 | 49,729 | 42,977 | 23,683 |